IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



MYRTLE LEIGH CRAWFORD

v.

CIVIL NO.: 3: *12CV846*

BANK OF AMERICA, N.A.,
SERVE: CT Corporation System, Registered Agent
      4701 Cox Road, Suite 301
      Glen Allen, VA 23060

and

EXPERIAN INFORMATION SOLUTIONS, INC.,
SERVE:  David N. Anthony, Registered Agent
      1001 Haxall Point
      Richmond, VA 23219

and

TRANSUNION, LLC.,
SERVE:  Corporation Service Company, Registered Agent
      11 S. 12th Street
      Richmond, VA 23218

and

EQUIFAX INFORMATION SERVICES, LLC.,
SERVE:  Corporation Service Company, Registered Agent
      11 S. 12th Street
      Richmond, VA 23218

## COMPLAINT

The Plaintiff, Myrtle Leigh Crawford, (hereafter "Plaintiff"), by counsel, and for her

Complaint against Defendants, alleges as follows:

1

## PRELIMINARY STATEMENT

1. This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to 15 U.S.C. § 1681 *et seq.* (Federal Fair Credit Reporting Act or "FCRA"); 12 U.S.C. § 2601 *et seq.* (Real Estate and Settlement Procedures Act or "RESPA"); breach the implied covenant of good faith and fair dealing, common law defamation, and conversion/trespass to chattel under Virginia law.

2. At its simplest, the FCRA claims in this case allege that Bank of America inaccurately reported Plaintiff as having defaulted on her mortgage and otherwise having violated her obligations to Bank of America as a creditor. There is no objective basis for Bank of America to have reported this to the credit bureaus. For all of her financial struggles over the years, Plaintiff has paid her mortgage and honored her obligations in the manner that Bank of America had insisted.

3. When Plaintiff learned that Bank of America had incorrectly placed her mortgage payments in an escrow account, failed to credit any of her payments since July 2009 in the manner prescribed in the Deed of Trust, reported her as delinquent and later, in default, and that such inaccuracies had destroyed her credit and put her into foreclosure, Ms. Crawford began a dispute process, first directly to Bank of America and then through the national credit bureaus. Bank of America then refused to investigate or correct its defamatory reporting. In doing so, it violated both the FCRA and the RESPA.

4. Plaintiff also brings this suit based state law claims for breach of the covenant of good faith and fair dealing implied into every Virginia contract. In this case, the Plaintiff and Defendants were parties to a note and deed of trust, both contracts under Virginia law. The simple allegations are: In July of 2009, BoA failed to properly credit Ms. Crawford's mortgage

account with her payment. In each successive month, BoA failed to credit Ms. Crawford's timely mortgage payments and reported to the Consumer Reporting Agencies that she was delinquent and in default. In approximately October of 2011, Ms. Crawford applied for a loan modification from BoA, which was never acted upon. Even though Ms. Crawford had been paying her mortgage on time, in February of 2011, BoA suddenly stopped accepting payments and informed Ms. Crawford that it was foreclosing. She was able to convince BoA to stop the foreclosure and make a decision on her completed loan modification application, at which point they offered her a Trial Period Plan (TPP). Despite BoA's attempts to cause Ms. Crawford to miss payments, she made each TPP payment on time, in full and in accord with the TPP agreement. After three months, BoA offered a loan modification, which Ms. Crawford accepted. Despite this, BoA continues to report to the CRAs that she is delinquent and in default. When a mortgage lender promises (in writing even) to modify an eligible loan to prevent impending default, homeowners who live up to their end of the bargain have a right to expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure and to which it agreed when receiving a huge taxpayer funded bailout.

5. In 2008, Bank of America accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On April 17, 2009, Steve R. Bailey, Sr. Vice President of Bank of America signed a contract with the U.S. Treasury agreeing to participate in HAMP -- a program in which Bank of America received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

6. As a participating servicer in HAMP, Bank of America has, in turn, entered into written agreements with consumers for temporary trial modifications.[1] Consumers like the Plaintiffs have complied with these agreements by submitting the required documentation and making payments. Despite such efforts, Bank of America has ignored its contractual obligations to modify their loans permanently.

## JURISDICTION

7. This Court has federal question jurisdiction of under the FRCA, 15 U.S.C. § 1681(p), the RESPA, 12 U.S.C. §2605(f), and 28 U.S.C. §1331.

8. This court also has jurisdiction over the state law claims by supplemental jurisdiction under 28 U.S.C. §1367.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch the Defendant maintains registered offices within the boundaries of the Eastern District of Virginia, Plaintiffs reside in this District and a significant part of events in the Plaintiff's claim occurred in Richmond, Virginia.

## PARTIES

10. The Plaintiff, MYRTLE LEIGH CRAWFORD ("Plaintiff"), is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

11. Upon information and belief, BANK OF AMERICA, N.A., is a National Bank doing business as a mortgage originator and servicer, and at all times relevant hereto was a "furnisher" as governed by the FCRA.

12. Bank of America, N.A. is the entity that contracted with the United States Department of Treasury as alleged below.

---

[1] This is a "consumer with Bank of America, Bank of America with consumer" direct contract rather than the "Bank of America with U.S. Government, U.S. Government with Bank of America" contract. The former is a simple common law contract to which the consumer is a party, while in the latter, consumers are only a third party.

13. Upon information and belief, BAC HOME LOAN SERVICING, LP was and is a wholly owned subsidiary of Bank of America, N.A. created and operated with shared management and control as the servicing agent for Bank of America, N.A. Upon information and belief the Plaintiff alleges that BAC Home Servicing, L.P. is also a servicer under RESPA and at all times relevant hereto was a "furnisher" as governed by the FCRA.

14. BAC Home Servicing, L.P. is the entity that contracted and issued the loan modification and trial plan for Plaintiffs.

15. For all factual and legal purposes relevant to this complaint, both Defendants operated as a single mortgage lending and servicing entity. It has shared ownership, shared management and represented to the public and the Plaintiff that they were one and the same.

16. Upon information and belief, EXPERIAN INFOMRATION SOLUTIONS, INC., ("Experian"), is a corporation authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

17. Upon information and belief, Experian is a consumer reporting agency as defined by 15 U.S.C. § 1681(f). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

18. Upon information and belief, Experian disburses such consumer reports to third parties under contract for monetary compensation.

19. Upon information and belief, TRANSUNION, LLC, ("TransUnion"), is a corporation authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

20.     Upon information and belief, Trans Union is a consumer reporting agency as defined by 15 U.S.C. § 1681(f).  Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

21.     Upon information and belief, Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

22.     Upon information and belief, EQUIFAX INFORMATION SYSTEMS, LLC. ("Equifax") is a corporation authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

23.     Upon information and belief, Equifax is a consumer reporting agency as defined by 15 U.S.C. § 1681(f).  Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

24.     Upon information and belief, Equifax disburses such consumer reports to third parties under contract for monetary compensation.

## FACTUAL BACKGROUND

### A. The Foreclosure Crisis

25.     Over the last several years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2] Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation.  The latest total represents a

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at
http://cop.senate.gov/reports/library/report-100909-cop.cfm.

22 percent increase from the first quarter of the year and nearly 15 percent above the level reporting for the second quarter of 2009.[3]

26.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

### B.  Creation of Home Affordable Modification Program

27.     Motivated in significant part by such concerns, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

28.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. § 5201.

29.     The Act established the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211.  In exercising its authority to administer TARP, the Act mandated that the Secretary of Treasury take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).   It further mandated that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures" and to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. § 5219.

---

[3]   www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

30.     On February 18, 2009, the Treasury Secretary and the Director of the Federal Housing Finance Agency created a uniform loan modification protocol, previously identified as HAMP, the program that is at issue in this case.

31.     HAMP is funded by the federal government, primarily with TARP funds. In the last two years, the Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

## C.   Bank of America's Broken Promises Under HAMP

32.     The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Bank of America is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

33.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

34.     Should a servicer elect to participate in HAMP, they execute a Servicer Participation Agreement ("SPA") with the federal government[4]. On April 17, 2009, Steve R. Bailey, Sr. Vice President of Bank of America, NA, executed an SPA, thereby making Bank of America, N.A. a participating servicer in HAMP.

---

[4] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

35.   The SPA executed by Bank of America incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.A.), and are incorporated by reference herein.

36.   A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan.[5] The Trial Period Plan defines a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

37.   Bank of America offers Trial Period Plans to eligible homeowners by way of a Trial Period Plan Agreement, which describes the homeowner's duties and obligations under the plan and contractually promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

38.   If the homeowner executes the Trial Period Plan Agreement, complies with objective documentation requirements and makes all three Trial Period Contract monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

39.   There is no lender or servicer discretion involved or permitted.   Once the servicer/lender contracts a Trial Period Plan, the consumer will be entitled to a permanent modification so long as they produce the defined set of documents required to verify the facts

---

[5] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

previously stated and also comply with the plan payment requirements during the Trial Period Plan. Further, the terms of that permanent modification are also non-discretionary and are objectively determinable for each consumer based on the "waterfall" analysis required under the HAMP program.

40.     Bank of America has routinely failed to live up to its end of Trial Period Plan Agreements and to offer permanent modifications to homeowners. In March 2010, the U.S. Treasury reported that Bank of America had 1,085,894 HAMP-eligible loans in its portfolio. Of these loans, just 32,900 resulted in permanent modifications (approximately 3 %) even though many more homeowners had made the payments and submitted the documentation required by their Trial Period Plan Agreement.

41.     By failing to live up to the Trial Period Plan Agreements and convert them into permanent loan modifications, Bank of America is not only leaving homeowners in limbo and stressful anxiety, wondering if their home can be saved, Bank of America is also preventing homeowners from pursuing other avenues of resolution, including obtaining alternate lending or using the money they are putting toward Trial Period Plan payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default or reducing the harm from it.

### D.  Factual Allegations as to Plaintiff regarding RESPA, Defamation and Breach of the Implied Covenant of Good Faith and Fair Dealing

42.     Ms. Crawford has lived in her home for over 19 years.  In fact, the home has been in her family since 1952.   In 2005, she was targeted by Countywide Home Loans ("Countrywide") and solicited to take out a mortgage on her home in the amount of $ 120,000.00. The loan she entered was an adjustable rate mortgage (ARM).

43.     Ms. Crawford is a senior citizen who works as a licensed practical nurse.

44.     Bank of America acquired Countrywide Home Loans, and with that acquisition, Bank of America acquired the servicing of the Plaintiff's mortgage.

45.     Ms. Crawford made her mortgage payments each month, usually by writing a personal check and sending it to Bank of America, U.S. First Class mail, postage prepaid, together with a payment coupon. In many months, she overpaid the amount due and owing on her mortgage payment.

46.     In approximately October 2011, Plaintiff applied for a loan modification with BoA by completing a Home Affordable Mortgage Program application and submitting it to Bank of America, with the requested documentation including the signed Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for HAMP.

47.     BoA sent a rejection letter to Plaintiff on October 13, 2011, stating that Ms. Crawford's loan was not modification-eligible under the Home Affordable Modification Program due to the Net Present Value (NPV) calculation.

48.     Upon information and belief, the reason supplied by BoA to deny Ms. Crawford's loan was not a true reason and/or the explanation of the NPV did not provide Ms. Crawford enough information to know.

49.     Ms. Crawford continued to make monthly mortgage payments after she had been denied a modification.

50.     In block 9 "Imminent Default Flag" of the NPV Values, the value used in the NPV calculation indicated a value of "N," meaning "two or more payments are due and unpaid by the end of the month in which they are due at the time of application." As of October 13,

2011, it was not true that "two or more payments" were "due and unpaid by the end of the month in which they are due at the time of application."

51.     In block 19 "Principal and Interest Payment before Modification," the amount indicated was $697.21.

52.     In block 20 "Monthly Real Estate Taxes and monthly hazard and Flood Insurance," the amount indicated was $228.40.

53.     In block 21 "Homeowners Association Dues/Fees," indicates a value of $13.58. Ms. Crawford does not belong to such and association and has never accrued such fees.

54.     In block 22, "Months Past Due," indicates 2 months past due.

55.     Neither the letter nor the NPV chart provides an explanation why the NPV makes the loan ineligible for loan modification under HAMP.

56.     Within the time permitted in the letter, Ms. Crawford requested that her loan modification application be reconsidered for HAMP or other modification as indicated in the denial letter.

57.     Upon information and belief, BoA did not act upon the request to reconsider the application, which "sat on someone's desk."

58.     BoA communicated with Ms. Crawford by way of two letters: one dated November 29, 2011, and one a day later, November 30, 2011. The letters stated that her property was being referred for foreclosure because, "which typically begin after you have made no payments for at least 90 days."

59.     In approximately February 2012, BoA refused to accept and, in fact, returned Ms. Crawford's monthly mortgage payment, and informed her that she was in default and going to suffer foreclosure. BoA also returned other amounts to Ms. Crawford.

60.     Ms. Crawford was not in default, she was not delinquent, and she had not missed making a monthly payment on her mortgage.

61.     Ms. Crawford also learned that her line of credit from TowneBank had been frozen as a result of the impending foreclosure.

62.     Ms. Crawford contacted BoA by phone to learn the reason that it was forcing her into foreclosure since she was current on her monthly mortgage payments and she had received no information about her re-application for a loan modification.

63.     Ms. Crawford was informed she would have to meet with BoA officials at their Richmond, Virginia, offices in order to determine whether BoA would forbear on its plans to foreclose.

64.     Ms. Crawford did meet with a BoA official on March 6, 2012, whose name was Sandra Valencia.   At this meeting, Ms. Crawford was informed that her completed loan modification application had been "sitting on someone's desk" and that's why it hadn't been acted on.   She was not informed of the reason that BoA considered her to be delinquent, in default, and subject to foreclosure.   Instead, she was told that BoA would reconsider her HAMP application if she completed a brand new application, which she did.

65.     On March 27, 2012, Ms. Crawford also sent a Qualified Written Request to BoA, chronicling the facts and requesting information about her loan as provided by RESPA.

66.     By letter dated April 2, 2012, Christina Denholm "VP, ReconTrust Legal Support" sent a letter to Ms. Crawford "as a response to your request for verification of the indebtedness relative to the above-identified account."   ReconTrust is the foreclosure trustee purportedly appointed by Bank of New York Mellon on behalf of the owners of the note.   The letter provided some, but not all of the important information requested in her QWR if, in fact, it

was a response to the QWR. This letter provided an account history, a copy of the note, deed of trust, the assignment of substitute trustee by the Bank of New York Mellon to appoint ReconTrust as substitute trustee for the purpose of foreclosing.

67.    By letter dated April 5, 2012, BoA offered Ms. Crawford a TPP, with monthly payments to be $782.24 per month, to start on May 1, 2012.

68.    In bold lettering at the top of the TPP, it reads: **This is your Trial Period Plan. You're on the way toward an affordable mortgage payment. To accept our offer, make your first payment today.**

69.    According to the first page of the TPP instructions, Ms. Crawford was required to: **Send in your monthly Trial Period Plan payments – instead of your normal monthly mortgage payments – as follows:** 1st payment:  $ 782.24 by 05/01/2012; 2d payment:  $ 782.24 by 06/01/2012; 3d payment:  $ 782.24 by 07/01/2012

70.    In addition, she was further instructed: The terms of your Trial Period Plan below are effective on the day you make your first Trial Period Plan payment, provided you have paid it on or before 05/01/2012. You and we agree that: If your loan was previously referred to foreclosure, we have made a request to the court or the foreclosure trustee to halt the foreclosure sale.

71.    She made the first the payment by check, by certified mail on April 24, 2012, which was posted to her mortgage account, acknowledged by Bank of America, and was in accordance with the express instructions of the TPP:  to make the 1st payment by 05/01/2012.

72.    This Trial Period Plan Agreement was entitled "Home Affordable Modification Trial Period Plan," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material

respects, then the Servicer will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

73.    The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

74.    Plaintiff made her TPP payment for the months of April, May and June, 2012, on time and in full.

75.    In May of 2012, Ms. Valencia called Ms. Crawford to inform her that she (a) had made her May 1, 2012, payment too early, (b) that it would not be credited to her TPP, and (c) that the payment could not be made by mail to the address in the TPP but instead only by telephone. In order to stay in the program, Ms. Valencia informed Ms. Crawford that she must make an additional mortgage payment for May not later than May 15, 2012.

76.    Ms. Crawford pointed out to Ms. Valencia that she had complied with the terms of the TPP. Ms. Crawford sought the assistance of counsel to intervene with BoA. Several days later, Ms. Valencia called Ms. Crawford to inform her that BoA would accept the April 24, 2012, payment and apply it to the TPP, but that she must make the next payment by telephone at the number in the TPP in order to stay in the program, and that the payment had to be made on June 1, 2012, and not before.

77.    On June 1, 2012, Ms. Crawford called 800-669-6650, which is the phone number in the TPP that is designated to take phone payments. Despite calling the special number

provided by BoA for the purpose of making a TPP payment on the phone, not a single BoA employee would accept the payment over the phone. She was instructed to call the following: 1-800-669-0102; then, Sarina Walsh at 480-457-3047; then, Karen Riccoli at 480-457-7191; then, Tara Kenney at 480-457-3540; and finally, "James" at 817-864-5277.

78.    Ms. Crawford was repeatedly informed that she had to make the payment only through Sandra Valencia. However, when Ms. Crawford called Ms. Valencia for assistance, she learned that Ms. Valencia was out of the office until June 4, 2012.

79.    On June 4, 2012, Ms. Crawford called Ms. Valencia, who said that she was not authorized to accept payment over the phone and that Ms. Crawford had to continue to call 800-669-6650. Eventually, Ms. Crawford spoke to a BoA employee named Cathreen Quahi, who processed the June payment over the phone. However, unbeknownst to Ms. Crawford, the amount that BoA took from Ms. Crawford's account was more than double what she had authorized.

80.    Ms. Crawford authorized Ms. Quahi, on behalf of BoA, to cause $782.24 to be paid from Ms. Crawford's BB&T account.

81.    On June 10, 2012, Ms. Crawford was contacted by BB&T, who informed her that BoA – without any authorization to do so – had taken $1723.08 out of Ms. Crawford's BB&T account instead of the $782.24 as she had instructed.

82.    As a result of BoA's actions, Ms. Crawford's BB&T account was overdrawn, resulting in a cascade effect including loss of access to her money, overdraft and other fees, embarrassment, frustration and humiliation associated with having to get BB&T to investigate and correct the problem that BoA had caused.

83.    On June 12, 2012, Ms. Crawford sent another Qualified Written Request to BoA requesting that, among other things, it investigate and explain the June 4, 2012, action by Bank of America to make an unauthorized transaction and to also to investigate BoA's previous error that caused the mortgage to be improperly calculated, and provide other information to which she was entitled under RESPA.

84.    By letter from Louise Bowes, from the law firm of Blank Rome, LLP, dated June 12, 2012, Ms. Crawford received a response to her March 27, 2012, QWR. Her response answered some of Ms. Crawford's questions and referred her to an enclosed account history, but did not answer the most important questions or provided information in a format that Ms. Crawford could understand that explained BoA's accounting on her loan. BoA also failed to provide documents requested by Ms. Crawford.

85.    On July 1, 2012, Ms. Crawford made a timely mortgage payment in accordance with the instructions on the TPP.

86.    On July 30, 2012, BoA sent a letter to Ms. Crawford that read, "enclosed is the loan history statement you requested that provides a detailed outline of transactions for the above-referenced loan.

87.    The transaction record indicates that BoA did not accurately record the account activity on Ms. Crawford's account at the time she entered the TPP through July 30, 2012. The transaction history showed payments were posted as follows: April 23, 2012 payment of $782.24, which payment was placed in "unapplied total"; May 22, 2012 payment of $782.24; June 4, 2012 payment of $1723.08; June 5, 2012 payment of $923.85; June 18, 2012 payment of $782.24; July 3, 2012, payment of $782.24. All of these "total payments" were place in

"unapplied total." The total deposit amount was $ 4,052.81. Several of the deposits were incorrect.

88.     The transaction history also showed debits or reversals as follows: May 7, 2012, city taxes paid in the amount of $908.85; May 22, 2012, misc. posting -782.24; June 5, 2012, misc. posting -1,847.70; June 8, 2012, misc. posting -782.24; June 18, 2012, payment reversal - 923.85; June 18, 2012 misc. posting -1,723.08. Not counting the city taxes, the total debit amount was $ 6,059.11.

89.     On August 1, 2012, Ms. Crawford made a timely mortgage payment in accordance with the instructions on the TPP. Ms. Crawford sent the payment by certified mail, and the receipt demonstrates that it was received by BoA by August 5, 2012.

90.     On August 30, 2012, Ms. Crawford received correspondence from BoA that showed "total payments due to bring the loan current" was $12,942.26 and that her minimum payment was $932.30. Since she had entered a loan modification on June 22, 2012, with an effective date of August 1, 2012, and a monthly payment of $779.54, BoA's statement and accounting were incorrect.

91.     On August 31, 2012, Ms. Crawford received correspondence from BoA that it did not post her account with the August mortgage payment until August 31, 2012, despite having received it on or before August 5, 2012.

92.     Upon information and belief, from the documents, correspondence and accounting Ms. Crawford has received from BoA including its scant responses to her QWRs, BoA has illegally charged fees, costs, late charges, and other amounts to Ms. Crawford's account. Indeed, BoA has not accurately maintained Ms. Crawford's account.

93.    On or about September 1, 2012, Ms. Crawford paid her September mortgage payment.

94.    On September 27, 2012, Ms. Crawford received a correspondence from BoA that "This account is past due" and that BoA had not received the September mortgage payment. "Total payments due to bring the loan current" read $1,559.08.

95.    On or about October 4, 2012, Ms. Crawford made her payment in person at a BoA branch, for which she received a counter receipt from the teller.

96.    Ms. Crawford then received correspondence from BoA dated October 9, 2012, stating "Thank you for your recent payment to Bank of America, N.A., your home loan servicer. However, your loan payment for the current month has not been received. As of October 9, 2012, the total due on your loan is $779.54, which includes the payment due on October 1, 2012."

97.    Among other things, the October 9, 2012, letter also stated "we previously sent you a notice informing you of the amount needed to reinstate your loan. The acceleration date of August 11, 2011 provided on that notice remains in effect. If the amount due is not receive by the specified acceleration date, foreclosure proceedings may begin or continue." The letter also states that if "you are making payments in compliance with a trial modification, forbearance, or repayment plan, please review the agreement for more detailed foreclosure information – we will not foreclose if you are complying with the terms of the agreement."

98.    Ms. Crawford called Ms. Valencia, who confirmed that the account appeared to be in non-compliance with the modification and did not reflect an October payment. When Ms. Crawford told her that she had a receipt for the October payment, Ms. Valencia stated that she had checked elsewhere on the system and confirmed that Ms. Crawford had made the October payment.

99.    Ms. Valencia stated that "it was out of her hands" and that she was concerned because the two systems did not coincide.  She recommended calling the Office of the President.

100.    Upon information and belief, although the "Office of the President" is designated to handle escalation issues, it actually takes no extraordinary actions that could not be accomplished by "regular" BoA mortgage customer service employees.

101.    On October 19, 2012, Ms. Crawford sent another QWR to BoA requesting information regarding its most recent failure to properly credit her account, why it was claiming that her loan was not current and requesting additional and different amounts to bring the loan current, why it was threatening to foreclose, and why she was being charged late fees when she had paid on time.  Included with that QWR, Ms. Crawford included proof of payment for August, September and October 2012; the October 9, 2012, letters to her from BoA; her loan modification and her account statements from August, September.

102.    By letter dated November 5, 2012, Bank of America did partially respond to Ms. Crawford's QWR correspondence, but failed to respond in a meaningful way under RESPA. However, for the first time, BoA provided a Fee Transaction History that detailed fees it improperly charged to Ms. Crawford's account before and after the loan modification, including multiple property inspections, title fees, foreclosure costs, mailing and recording fees.

E.   **Factual Allegations Regarding Plaintiffs' FCRA Claims against Bank of America, Equifax, Experian and Trans Union**

103.    In approximately March of 2012, Plaintiff obtained copies of her credit reports from the Consumer Reporting Agencies (CRAs) Experian, Trans Union, and Equifax and learned that each were reporting inaccurate, derogatory information including that her mortgage was more than 180 days past due, which was untrue.

104.    Specifically, Plaintiff's credit files indicated that she had not made a payment on her mortgage loan to Bank of America since July of 2010.

105.    This credit reporting was inaccurate because Plaintiff had made payments on her mortgage loan from its inception through January 2012, when Bank of America refused to accept her payments and instructed her to not make any payment because it was referring her loan for foreclosure.

106.    On June 11, 2012, Plaintiff wrote to each Experian, Trans Union and Equifax disputing the inaccurate reporting, demanding an investigation and correction of her credit file. She sent these letters by certified, first class U.S. Mail, postage prepaid.   The receipts demonstrate that Equifax received the dispute on June 17, 2012, and Trans Union on June 18, 2012. The letter Ms. Crawford sent to Experian at P.O. Box 2104, Allen, TX 75013, was returned as "ATTEMPTED - NOT KNOWN - UNABLE TO FORWARD."

107.    Despite the fact that Ms. Crawford had sent the Experian dispute to an address that was published on Experian's website for disputes, Ms. Crawford resent the dispute to Experian at P.O. 9701, Allen, TX 75013.

108.    Upon information and belief, BoA conducted no investigation or re-investigation into Plaintiff's disputes, had no process in place to properly investigate and therefore did nothing to correct the inaccurate reporting despite knowing that Ms. Crawford was not 180 days delinquent, that she had applied for a loan modification in September of 2011, and that she was in a TPP at the time the request was made.

109.    Upon information and belief, Equifax, Experian and Trans Union conducted NO actual investigation of the Plaintiff's dispute, other than to forward the dispute to BoA, which BoA verified.

110.    By letter dated June 21, 2012, four days after it had received Ms. Crawford's dispute, Equifax wrote to Ms. Crawford with the results of its investigation, "We have researched the credit account. Account # - 10193* The results are:  This creditor has verified to OUR company that the current status is being reported correctly.  The creditor has verified to OUR company that the prior paying history is being reported correctly."

111.    On June 21, 2012, Equifax reported what BoA had verified, that the loan was "Over 120 Days Past Due," "180 Days or More Past Due," had an account balance of $130,235, with a past due amount of $7390.00, scheduled payment of $923, and date of last payment as 02/2012.

112.    By letter dated June 27, 2012, TU responded to the dispute that there was new information, but that the so-called investigation did not resolve the dispute.  In fact, TU was still inaccurately reporting that the account was 120 days past due, among other inaccuracies.

113.    Upon information and belief, Trans Union, Experian and Equifax each forwarded Plaintiffs' dispute letters with their enclosures to Bank of America, which verified the inaccurate information on Plaintiff's credit files.

114.    Plaintiff did not receive a response from Experian until September 17, 2012, which reported the inaccuracies as verified.

115.    On or around the first week of September, Plaintiff forwarded follow-up written dispute letters to Experian, Trans Union, and Equifax regarding the erroneous results of their investigations into the inaccurate mortgage account reporting within their credit files. Plaintiff disputed the "more than 120 day" delinquent reporting, as well as (1) an incorrect amount past due; (2) an incorrect balance; (3) an incorrect monthly scheduled payment amount; (4) incorrect actual payment amount; (5) incorrect terms duration; (6) incorrect date of last payment.  Plaintiff

enclosed a copy of a loan modification they received from Bank of America and proof of payments made from July 2010-January 2012. Plaintiff also disputed the reporting as of the date she submitted the completed application for a loan modification in September 2011, and as of the date she entered a loan modification in June 2012.

116. The Bank of America reports are false. Plaintiff made mortgage payments to Bank of America each month from July 2010 though January 2012, at which time her payments were refused and she was instructed not to pay and that she was being referred to foreclosure.

117. BoA had actual knowledge of these inaccuracies and deliberately chose to ignore and permit reporting of the inaccurate account.

118. Experian, Trans Union, and Equifax have knowledge that Bank of America mortgages are often reported inaccurately by BoA, especially the mortgage loans that are subject to modification. Despite this knowledge, Experian, Trans Union and Equifax lack a system, procedure or protocol to ensure accurate credit reporting of mortgages and modified mortgages.

119. All Defendants had actual knowledge of the inaccuracies related to Ms. Crawford's mortgage, yet they deliberately chose to ignore it and continued inaccurate reporting of the account.

120. Upon information and belief, Experian, Trans Union, and Equifax each prepared and published to multiple third parties inaccurate consumer reports about Plaintiff, which contained inaccurate derogatory information regarding her account.

121. Upon information and belief, Experian, Trans Union, and Equifax each forwarded Plaintiffs' disputes to Bank of America on one or more occasions. Upon information and belief, Bank of America was provided notice of Plaintiffs' disputes and despite such notice, it failed and refused to investigate and correct its inaccurate reports.

122.    By letter dated September 11, 2012, BoA wrote to Ms. Crawford regarding "a Credit Reporting Adjustment" and that "we are pleased to inform you that this request has been completed" and the "corrected information was submitted on 09/11/2012 to the credit reporting agencies." There is also a notation that it takes 60 days to correct a consumer report, and there is no indication by BoA's letter what correction it purported to make, if any.

123.    Upon information and belief, Bank of America verified its false reporting as of September 17, 2012, despite Plaintiff's evidence that the reporting was incorrect.

124.    Upon information and belief, BoA verified as accurate its reporting to all three CRAs.

125.    On September 17, 2012, TransUnion wrote to Ms. Crawford that BoA had "verified, no change." However, TU added a "Consumer Statement" that was requested by the Plaintiff indicating that "The consumer's Bank of America account is being reported inaccurately, she has never failed to pay her mortgage on time. Despite providing ample proof that the account is being reported inaccurately, neither Bank of America or any Consumer Reporting Agency will conduct a proper investigation."

126.    With respect to Equifax, as of October 19, 2012, it was reporting the "Loan modified under a federal government plan," but also as having a past due amount of $11,077.00, that the date of the last payment was July of 2012, and that the scheduled payment amount was $923.00. Except for the fact that the loan was modified, it is inaccurate to state that the loan is past due, that the last payment was in July, and that the monthly payment is $923.

127.    With respect to Experian, as of October 19, 2012, it was reporting "Loan modified under a federal government plan," but also retaining its prior inaccurate credit reporting concerning the alleged delinquency.

128.   In approximately August of 2012, Ms. Crawford suffered heart problems requiring hospitalization.  Her episode of heart problems were brought on or exacerbated by, among other things, the attempts by BoA to foreclose; BoA's communication with her that the payments she was making on the TPP and loan modification were incorrect, not received, sent too early, sent to the wrong place; communication from BoA that despite the executed loan modification, she was in arrears in varying amounts;  inaccurate derogatory credit reporting that caused her stress; draining her bank account without any authorization to do so, causing her to be without money to pay her bills and to undergo the humiliation and inconvenience of fixing it herself without any assistance from BoA; the knowledge that an inaccurate and infamous delinquency reported on her consumer report made it look like she hadn't made a mortgage payment for two years; and that her ability to find employment may be negatively impacted by her consumer report.

129.   In approximately August of 2012, Ms. Crawford received a notice from her insurance company, Allstate Fire & Casualty Company, that it was raising her insurance premiums based on the information contained in her consumer report.

130.   Ms. Crawford has experienced loss of money and her valuable time as a result of BoA's actions.  She has also suffered humiliation, embarrassment, loss of sleep, stress, and anxiety leading to exacerbation of her heart condition. She has suffered a freeze on her line of credit from TowneBank, overdraft on her BB&T account, loss of access to her money in her BB&T account, an increase in her insurance rates, and damage to her credit.

## COUNT ONE: BREACH OF CONTRACT FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (BANK OF AMERICA)

131.   Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

132.   A covenant of good faith and fair dealing exists in every valid Virginia contract, including notes and deeds of trust pertaining to real property such as the note and deed of trust pertaining to Plaintiff's property. A breach of the covenant of good faith and fair dealing is a breach of the underlying contract.

133.   Bank of America failed to perform its duty of good faith and fair dealing with respect to Plaintiff by such actions as refusing to timely credit her payments to her account; for referring her to foreclosure despite the fact she had never failed to make a monthly payment; for failing to accurately keep her account in order; causing her to apply for a HAMP loan modification and Trial Period Plan without disclosing that it would consider the reduced monthly payment to be a delinquency or default that would place the loan into arrears and could trigger foreclosure; failing to provide a true reason for denying her loan modification; failing to timely reconsider her appeal of their initial denial; failing to abide by the terms of the Note and Deed of Trust that govern the original loan; failing to follow HAMP guidelines; failing to properly safeguard and maintain important documents provided by Plaintiff; after inducing Plaintiffs to enter into a TPP, Bank of America consistently refused to timely credit TPP payments to her account; threatening to kick her out of the TPP by falsely stating she had not made her payments in a proper way; telling her conflicting information about how to make payments; refusing to accept payments that she attempted to make by phone; making an unauthorized withdrawal from her BB&T account; sending successive conflicting statements regarding her account; to the extent that she may have made any payment that was less than the full amount of the monthly payment, failing to work out a plan to pay for alleged arrearages it claimed were due and owing,

instead of foreclosing; threatening to accelerate the loan; threatening to foreclosure on Plaintiff's property; failing to accurately and timely account for payments made by the Plaintiff from the point she entered the loan modification.

134. Bank of America's breach of its duty to act in good faith and deal fairly with Plaintiffs breached the Note and Deed of Trust.

135. Because of its breach of the implied covenant of good faith and fair dealing, Bank of America is not entitled to exercise its remedy of foreclosure under the Deed of Trust.

136. Plaintiffs also suffered actual damages, including but not limited to, loss of the money that BoA took without authorization from her BB&T accounts, the accrual of default servicing fees and foreclosure fees, the assessment of late and other fees. She is threatened with additional harm from Defendant's breach because it has not corrected its inaccurate accounting of Plaintiff's account despite the loan modification she entered.

137. To the extent actual damages will not fully and fairly compensate Plaintiffs, they are also entitled to specific performance and other appropriate injunctive relief.

## COUNT TWO: VIOLATION OF FAIR CREDIT REPORT ACT
### 15 U.S.C. § 1681s-2(b)(1)(A)
### (BANK OF AMERICA)

138. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

139. On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate the Plaintiff's disputes.

140. As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(A), Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

141. The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles the Plaintiffs to recovery under 15 U.S.C. §1681o.

142. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT THREE: VIOLATION OF FAIR CREDIT REPORT ACT
### 15 U.S.C. § 1681s-2(b)(1)(B)
### (BANK OF AMERICA)

143. Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

144. On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

145. As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(B), Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

146. The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the

alternative, Bank of America was negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

147.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT FOUR: VIOLATION OF FAIR CREDIT REPORT ACT
## 15 U.S.C. § 1681s-2(b)(1)(C) and (D)
## (BANK OF AMERICA)

148.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

149.    On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the Bank of America representations within Plaintiff's credit files with Experian and Equifax without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

150.    As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

151.    The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

152.     Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT FIVE: VIOLATION OF REAL ESTATE AND
## SETTLEMENT PROCEDURES ACT
## 12 U.S.C. § 2605(e)
## (BANK OF AMERICA)

153.     Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

154.     On one or more occasions within the past two years, by example only and without limitation, Plaintiffs made multiple qualified written requests to Bank of America insisting that it conduct an investigation to correct inaccurate account information, inaccurate credit reporting and to provide information regarding their loan.

155.     Plaintiff made qualified written requests on March 27, 2012, June 12, 2012, and October 19, 2012.  Plaintiff's written communications were sent to the address at which they were instructed by Bank of America.

156.     Bank of America violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), by

   a.     Failing to timely conduct an appropriate investigation of Plaintiffs' inquiries;

   b.     Failing to conduct any investigation whatsoever regarding Plaintiffs' inquiries;

   c.     Failing to timely provide Plaintiffs with a true and accurate written explanation or clarification of the Plaintiff's legitimate questions regarding her loan;

   d.     Continuing to report information regarding allegedly overdue payments to the national credit bureaus.

157.    As a result of Bank of America's violations of 12 U.S.C. § 2605(e), the Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

158.    Bank of America is liable for actual damages in an amount to be determine by the Court pursuant to 15 U.S.C. § 2605(f).

159.    Bank of America's conduct appears to be a pattern and practice of misconduct with many consumers. Plaintiff has been a victim of this pattern of misconduct. For each violation of 12 U.S.C. § 2605(e), Bank of America is also liable to each Plaintiff for additional damages up to $1,000 per violation.

160.    Plaintiff is also entitled to recover costs and attorneys' fees from Bank of America in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f)(3).

### COUNT SIX: CONVERSION/TRESPASS TO CHATTEL
### (BANK OF AMERICA)

161.    The Plaintiff realleges and incorporates all prior paragraphs as if fully set forth herein.

162.    BoA's conduct also constitutes the Virginia-law torts of conversion and/or trespass to chattel. BoA attempted to literally steal money from the Plaintiff's personal bank account and would have done so had the Plaintiff's bank not informed her of the overdraft and quickly moved to block and stop BoA's attempted theft.

163.    As a result of BoA's attempted theft of Plaintiff's money, Plaintiff's bank charged fees to Plaintiff's account. Plaintiff was without the use of her money for a period of weeks, during which time Plaintiff needed the money to make her monthly mortgage payment. Further, as a result of Defendant's misconduct, the Plaintiff's became afraid, frustrated, embarrassed, inconvenienced and angry and suffered significant emotional and mental anguish and distress.

164.    Defendant's conduct was intentional and deliberate and was accomplished with legal and actual malice such as to justify and even require an award of punitive damages.

## COUNT SEVEN: DEFAMATION
## (BANK OF AMERICA)

165.    Plaintiff realleges every allegation above as if set forth herein in full.

166.    In addition to its violations of the Fair Credit Reporting Act, BoA has made multiple false statements that are not governed by 15 U.S.C. §1681s-2. BoA published the false representation that Plaintiff was past due on her mortgage obligation to the credit reporting agencies and through the credit reporting agencies to all of Plaintiff's potential lenders and others on several occasions.   For example only, based on BoA's report, the CRAs reported the inaccurate, derogatory information that BoA had verified, to Ms. Crawford's insurance company, Allstate Fire & Casualty Company. In turn, Allstate raised Ms. Crawford's insurance premium rates.

167.    These defamations were made with legal malice and a willful intent to injure the plaintiff by placing derogatory information on her credit reports. BoA had reason to know, both by virtue of information communicated to it by plaintiff and by its own records, that plaintiff had not refused to pay her obligation and that she had made her mortgage payments in each month that they reported she had made no payment. Further, BoA willfully adopted procedures that wholly ignored the demands of plaintiff, and other consumers generally, that inaccurate information should be removed from their credit files.

168.    As a result of BoA's conduct, actions and inaction, the plaintiff suffered various types of damage as set forth herein, including specifically, the loss of employment, loss of credit, the loss of the ability to purchase and benefit from a line of credit, and the mental and emotional pain, anguish, humiliation and embarrassment.

169.    These defamations were malicious, willful, deliberate, intentional and/or with reckless disregard for the interests and rights of plaintiff, so as to justify an award of punitive damages against Chase in an amount to be determined by the Court.

## COUNT EIGHT: VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(1)
### (EXPERIAN, TRANS UNION, EQUIFAX)

170.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

171.    Experian, Trans Union, and Equifax each violation 15 U.S.C. §1681i(a)(1) on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information or delete the item from the Plaintiff's credit files.

172.    As a result of violations 15 U.S.C. §1681i(a)(1) by Experian, Trans Union, and Equifax, the Plaintiff suffered actual damages, including but not limited to loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

173.    The violations by Experian, Trans Union, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the court pursuant to 15 U.S.C. § 1681n.  In the alternative, Experian, Trans Union, and Equifax were all negligent, which entitles the Plaintiff to recovery under 15 U.S.C. § 1681o.

174.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, Trans Union, and Equifax pursuant to 15 U.S.C. §§ 1681n & 1681o.

## COUNT NINE:  VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(2)
### (EXPERIAN, TRANS UNION, EQUIFAX)

175.    Plaintiff realleges and incorporates all other factual allegations in the Complaint.

176.    Experian, Trans Union and Equifax each violated 15 U.S.C. § 1681i(a)(2) on multiple occasions by failing to provide Bank of America with all the relevant information regarding the Plaintiff's dispute.

177.    Violations of 15 U.S.C. § 1681i(a)(2) by Experian, Trans Union and Equifax caused Plaintiff to suffer actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

178.    The violations by Experian, Trans Union and Equifax were willful, rendering each of the Defendants liable for punitive damages in an amount to be determined by the court pursuant to 15 U.S.C. § 1681n.  In the alternative, Experian Trans Union and Equifax were negligent, which entitles the Plaintiff to recovery under 15 U.S.C § 1681o.

## COUNT TEN: VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681i(a)(4)
## (EXPERIAN, TRANS UNION, AND EQUIFAX)

179.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

180.    Experian, Trans Union and Equifax each violated 15 U.S.C. § 1681i(a)(5)(A) on multiple occasions by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon lawful reinvestigation.

181.    As a result of the violations by Experian, Trans Union and Equifax, Plaintiff suffered damages including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

182.    The violations by Experian, Trans Union and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined

by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union and Equifax were negligent, which entitles the Plaintiff to recovery under 15 U.S.C. § 1681o.

183.    Plaintiff is entitled to recovery actual damages, statutory damages, costs and attorneys' fees from Experian, Trans Union and Equifax in an amount to be determined by the court pursuant to 15 U.S.C. §§ 1681n & 1681o.

## COUNT TEN: VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681i(a)(5)
## (EXPERIAN, TRANS UNION, AND EQUIFAX)

184.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

185.    Experian, Trans Union and Equifax each violated 15 U.S.C. § 1681i(a)(5)(A) on multiple occasions by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or to modify the information upon a lawful investigation.

186.    As a result of violations of 15 U.S.C. § 1681i(a)(5)(A) by Experian, Trans Union and Equifax, Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

187.    The violations by Experian, Trans Union and Equifax were willful, rendering each Defendant individually liable for punitive damages in an amount to be determined by the court under 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union and Equifax were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

188.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Experian, Trans Union and Equifax in and amount to be determined by the court pursuant to 15 U.S.C. §§ 1681n & 1681o.

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive

damages against Defendants, jointly and severally; for her attorneys' fees and costs; for pre-judgment and post-judgment interest at the judgment rate, and such other relief the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Myrtle Leigh Crawford

By_____
           Counsel

Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
 (757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

Kristi C. Kelly, VSB#72791
Andrew J. Guzzo, VSB#82170
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400 – Telephone
(703) 591-9285 – Facsimile
Email: kkelly@siplfirm.com
Email: aguzzo@siplfirm.com